**John BRIAND, Plaintiff,**

v.

**Kevin L. LAVIGNE, Defendant.**

**Nos. CIV.ME 02–40–P–H, CIV.NH 02–77–JD.**

United States District Court, D. Maine.

Aug. 14, 2002.

pushed and pulled we don't know where he's been, through his head.'").

John Briand, Hooksett, NH, plaintiff pro se.

T. David Plourde, U.S. Attorney's Office, Concord, NH, for Kevin L. Levigne, defendant.

James Starr, Clerk, Office of the Clerk, Warren B. Rudman U.S. Courthouse, Concord, NH, for Labels, notice only.

### ORDER AFFIRMING RECOM-MENDED DECISION OF THE MAGISTRATE JUDGE

HORNBY, Chief Judge.

The United States Magistrate Judge filed with the court on July 22, 2002, with copies to the parties, her Recommended Decision on Motion to Dismiss. The time within which to file objections expired on August 8, 2002, and no objections have been filed. The Magistrate Judge notified the parties that failure to object would waive their right to *de novo* review and appeal.

It is therefore ᴏʀᴅᴇʀᴇᴅ that the Recommended Decision of the Magistrate Judge is hereby ᴀᴅᴏᴘᴛᴇᴅ. The defendant Lavigne is ɢʀᴀɴᴛᴇᴅ ꜱᴜᴍᴍᴀʀʏ ᴊᴜᴅɢᴍᴇɴᴛ on Count V of the Petition and the remaining five counts are ᴅɪꜱᴍɪꜱꜱᴇᴅ ᴡɪᴛʜ ᴘʀᴇᴊᴜᴅɪᴄᴇ.

So ᴏʀᴅᴇʀᴇᴅ.

## RECOMMENDED DECISION ON MOTION TO DISMISS

KRAVCHUK, United States Magistrates Judge.

John Briand has filed a six-count complaint alleging that his United States Probation Officer, Kevin Lavigne, violated his civil rights in interactions he had with Briand concerning Briand's probationary court-ordered substance abuse/mental health counseling. (Docket No. 1.) Lavigne has responded with a motion seeking dismissal or, in the alternative, summary judgment. (Docket No. 15.)[1] For the following reasons I recommend that the court **DISMISS** with prejudice five counts because the statutes Briand relies upon do not create rights that are enforceable by individuals and **GRANT** Lavigne summary judgment on the remaining count which is premised principally on the Fourth Amendment and *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971).[2]

## DISCUSSION

### A. Counts Amenable to Dismissal

#### 1. Standard for Motion to Dismiss

In viewing Lavigne's motion to dismiss I,

must take as true "the well-pleaded facts as they appear in the complaint, extending [the] plaintiff every reasonable inference in his favor." *Coyne v. City of Somerville*, 972 F.2d 440, 442–43 (1st Cir.1992) (citing *Correa–Martinez v. Arrillaga–Belendez*, 903 F.2d 49, 51 (1st Cir.1990)). A complaint should not be dismissed under Federal Rule of Civil Procedure 12(b)(6) unless " 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' " *Roeder v. Alpha Indus., Inc.*, 814 F.2d 22, 25 (1st Cir.1987) (quoting *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)).

*Medina–Claudio v. Rodriguez–Mateo*, 292 F.3d 31, 34 (1st Cir.2002).

#### 2. Counts I, II, III, IV, and VI: Congress Did Not Create Privately Enforceable Rights Under the Statutes Upon Which Briand Relies

There are two initial clarifications required as a consequence of the manner in which Briand postures these claims. In the title of his complaint Briand expressly frames his action as one seeking remedies

---

1. This action comes to the District of Maine via the District of New Hampshire. Accordingly, the Local Rules for the District of New Hampshire govern the form of this motion, be it taken as a motion to dismiss or a motion for summary judgment. *See* Dist.N.H.Loc. R.Civ.P. 7.1, 7.2.

2. I decline Lavigne's invitation to dispose of this case on the grounds of allegedly improper service by Briand. Since his motion to extend time to answer on April 29, 2001, Lavigne has been able to ably defend this suit despite any imperfections in service and noncompliance with the rules and I believe it better to allow cases in this posture to be weighed on their merits. *See Rodriguez v. Ghoslaw*, 2002 WL 1424586, *1 (S.D.N.Y. 2002) ("Legislative and judicial efforts to reduce the burden of prison litigation on the district courts by creating procedural obstacles to prisoners' suits can sometimes have perverse effects.").

under *Bivens* and 42 U.S.C. § 1983. La- vigne is a United States Probation Officer and thus, to the extent he was acting under the authority of his position he was acting under color of federal law. With respect to alleged constitutional violations this is properly characterized as a *Bivens* action. 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619. *See also Day v. Mass. Air Nat'l Guard,* 167 F.3d 678, 683 (1st Cir. 1999) (observing that *Bivens* comprehends constitutional violations under color of fed- eral law, while § 1983 offers redress for constitutional violations under color of state law).

Second, with respect to the counts that allege violation of his rights under federal statutes, Briand, unlike § 1983 plaintiffs, does not need to cite *Bivens* as a vehicle to press the rights he identifies as estab- lished by the statutes. On this point I note that while in the past the United States Supreme Court has found a distinc- tion of significance between actions direct- ly under a federal statute and those seek- ing § 1983 relief for rights identified in a statute, this term it offered the following clarification vis-à-vis this facet of my inqui- ry:

> [T]he initial inquiry—determining whether a statute confers any right at all—is no different from the initial inqui- ry in an implied right of action case, the express purpose of which is to determine whether or not a statute "confer[s] rights on a particular class of persons." *California v. Sierra Club,* 451 U.S. 287, 294, 101 S.Ct. 1775, 68 L.Ed.2d 101 (1981). This makes obvious sense, since § 1983 merely provides a mechanism for enforcing individual rights "secured" elsewhere, *i.e.,* rights independently "se- cured by the Constitution and laws" of the United States. "[O]ne cannot go into court and claim a 'violation of § 1983'—for § 1983 by itself does not protect anyone against anything." *Chapman v. Houston Welfare Rights*

*Organization,* 441 U.S. 600, 617, 99 S.Ct. 1905, 60 L.Ed.2d 508 (1979).

A court's role in discerning whether personal rights exist in the § 1983 con- text should therefore not differ from its role in discerning whether personal rights exist in the implied right of action context. Both inquiries simply require a determination as to whether or not Con- gress intended to confer individual rights upon a class of beneficiaries. Ac- cordingly, where the text and structure of a statute provide no indication that Congress intends to create new individu- al rights, there is no basis for a private suit, whether under § 1983 or under an implied right of action.

*Gonzaga Univ. v. Doe,* — U.S. —, 122 S.Ct. 2268, 2276–77, 153 L.Ed.2d 309 (2002) (citations omitted from second para- graph). *See also id.* at 2275 ("[W]e ... reject the notion that our implied right of action cases are separate and distinct from our § 1983 cases. To the contrary, our implied right of action cases should guide the determination of whether a statute confers rights enforceable under § 1983.").

These preliminary concerns properly framed, I also find *Gonzaga University* helpful in setting the stage for my exami- nation of the statutes at hand for a deter- mination as to whether or not Congress intended to confer a private right of action on individuals benefited by the statutes. The *Gonzaga University* majority opinion begins by "reject[ing] the notion that [pri- or Supreme Court] cases permit anything short of an unambiguously conferred right to support a cause of action brought under § 1983." *Id.* at 2275. It elaborated:

> Section 1983 provides a remedy only for the deprivation of "rights, privileges, or immunities secured by the Constitution and laws" of the United States. Accord- ingly, it is *rights,* not the broader or vaguer "benefits" or "interests," that

may be enforced under the authority of that section.

*Id.* The Court stressed that " 'rights-creating' " language was "critical to showing the requisite congressional intent to create new rights." *Id.* at 2277.

Though Lavigne views all of Briand's counts as turning on alleged violations of 42 U.S.C. § 290dd–2[3] and argues only on this score, only Counts II, III, and IV are tethered to that statutory provision. In Count I, Briand asserts that Lavigne violated rights conferred on Briand by 42 U.S.C. § 9501. In Count VI Briand contends that Lavigne's actions ran afoul of a criminal statute, 18 U.S.C. § 241. Thus, I proceed to analyze these three distinct statutory provisions to determine if they are "right creating" and, therefore, create an implied right of action.

### a. Count I: 42 U.S.C. § 9501/ 42 U.S.C. § 10841

Title 42 contains two statements of a "bill of rights" for individuals "admitted to a program or facility for the purpose of receiving mental health services." 42 U.S.C. §§ 9501(1), 10841(1). Section 9501, entitled simply "Bill of Rights," was enacted as part of title 42's "Mental Health Systems" chapter; section 10841 is entitled "Restatement of Bill of Rights for Mental Health Patients," and is in the "Protection and Advocacy for Mentally Ill Individuals" chapter of title 42. As the First Circuit recognized in *Monahan v. Dorchester Counseling Center, Inc.*, 961 F.2d 987 (1st Cir.1992), § 10841 is a 1986 restatement of § 9501 that uses almost exactly the same language as § 9501. *Monahan*, 961 F.2d at 994.

Section 10841 of title 42 begins with the following paragraph:

It is the sense of the Congress that, as previously stated in title V of the Mental Health Systems Act [42 U.S.C.A. § 9501 et seq.], each State should review and revise, if necessary, its laws to ensure that mental health patients receive the protection and services they require, and that in making such review and revision, States should take into account the recommendations of the President's Commission on Mental Health[.]

§ 10841 (bracketed statutory reference in original). It then specifies that the states should admitted individuals a host of rights, the one relevant to Briand's action being "[t]he right to confidentiality of such person's records." § 10841(1)(H).

Two other provisions of this subchapter are of import to this right of action analysis. First, § 10851(a) provides that this subchapter "shall not be construed as establishing any new rights for individuals with mental illness." § 10851(a). Second, "the term 'individual with mental illness' has the same meaning as in section 10802( [4][4])." § 10851(b). Section § 10802(4) provides:

(4) The term "individual with mental illness" means, except as provided in section 10804(d) of this title, an individual—

(A) who has a significant mental illness or emotional impairment, as determined by a mental health professional qualified under the laws and regulations of the State; and

(B)(i)(I) who is an inpatient or resident in a facility rendering care or treatment, even if the whereabouts of

---

**3.** Briand references 42 U.S.C. § 290dd–3 and § 290ee–3(c). As Lavigne points out, these subsections were omitted from the federal statutory scheme and replaced by § 290dd–2 in 1992 by dint of the enactment of the Alco-

hol and Drug Abuse and Mental Health Administration Reorganization Act.

**4.** Section 10851(b) mistakenly references subsection (3) rather than subsection (4) of § 10802.

such inpatient or resident are unknown;

(II) who is in the process of being admitted to a facility rendering care or treatment, including persons being transported to such a facility; or;

(III) who is involuntarily confined in a municipal detention facility for reasons other than serving a sentence resulting from conviction for a criminal offense; or

(ii) who satisfies the requirements of subparagraph (A) and lives in a community setting, including their own home.

§ 10802(4) (publisher's footnote omitted).

For purposes of this analysis I will assume that this statutory scheme is intended to cover individuals using the type of substance abuse counseling services required to be utilized by Briand and that Briand can use its directive to the states in a suit against Lavigne, a federal actor. Briand nevertheless cannot pursue relief under its umbrella.

In *Monahan*, a 1992 decision, the First Circuit held that § 10841 (even if read in conjunction with § 9501) created no enforceable rights. It reasoned:

Th[e] use of the terms "should" and "the sense of Congress" [in the opening paragraph] indicate that the statute is merely precatory. Although no other federal court of appeals appears to have considered this question, we agree with the District Court for the Eastern District of Pennsylvania that,

[t]he statutory language, setting forth "the sense of Congress" and recommending that states "should" review their laws regarding mental health patients is plainly precatory. Also, the "rights" set forth are for the State's consideration when undertaking this review. Significantly, this section neither requires nor prohibits

any action on the part of the states or any other party. In addition, the legislative history is consistent with Congress's use of precatory statutory language. The Senate Report declares that the Bill of Rights is a "statement of Congressional viewpoint," and emphasizes that this section "*further encourages* each state to review and revise its laws to insure that mentally ill persons receive the protection and service they require."

*Brooks v. Johnson and Johnson, Inc.*, 685 F.Supp. 107, 108 (E.D.Pa.1988) (emphasis in original). *See also, Croft v. Harder,* 730 F.Supp. 342, 350–51 (D.Kan.1989) (same construction of § 9501).

961 F.2d at 994–95.

The First Circuit was guided in reaching this conclusion not only by *Brooks,* but by the United States Supreme Court's *Pennhurst State School and Hospital v. Halderman,* 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981), a case that concluded that the language of 42 U.S.C. § 6010, a statute setting forth a "bill of rights" for persons with developmental disabilities, was "hortatory, not mandatory" and, thus, not right conferring. 451 U.S. at 24, 101 S.Ct. 1531; *see also id.* at 19, 101 S.Ct. 1531 ("We are persuaded that § 6010, when read in the context of other more specific provisions of the Act, does no more than express a congressional preference for certain kinds of treatment. It is simply a general statement of 'finding' and, as such, is too thin a reed to support the rights and obligations read into it by the court below."). With *Pennhurst State School and Hospital* in view, *Monahan* reflected: "Section 10841 starts out by saying 'it is the sense of Congress' and uses the term 'should' throughout. Section 6010, on the other hand, discusses congressional "findings" and alternates between arguably mandatory language ('per-

sons ... have a right'), and language that is clearly precatory ('treatment ... should be designed')." 961 F.2d at 995 n. 8. "Section 10841," the Panel concluded, "uses language even more clearly precatory than § 6010, and we agree with the *Brooks* court that *Pennhurst* supports the conclusion that § 10841 creates no enforceable federal rights." *Id.* at 995 (footnote omitted).

With respect to § 10851(a), the First Circuit rejected the plaintiff's argument that § 9501 created rights and that § 10851(a) should be read in combination with § 9501 as a reiteration of the § 9501 created rights. *Id.* at 995 n. 9. "While clever," *Monahan* stated, "this argument is belied by the obviously precatory language in both §§ 9501 and 10841." *Id.*

■■■■ A lower federal court in this Circuit is bound by First Circuit precedent even if a subsequent Supreme Court decision might justify a reevaluation of that holding. *Stewart v. Dutra Const. Co., Inc.*, 230 F.3d 461, 467 (1st Cir.2000) ("Thus, the principle of *stare decisis* the doctrine that 'renders the ruling of *law* in a case binding in future cases before the same court or other courts owing obedience to the decision,' *Gately v. Massachusetts*, 2 F.3d 1221, 1226 (1st Cir.1993) is an integral component of our jurisprudence."); *Carpenters Local Union No. 26 v. U.S. Fid. & Guar. Co.*, 215 F.3d 136, 138 (1st Cir.2000) ("We have considerably greater freedom than the district courts to evaluate the impact of recent Supreme Court precedent on our previous decisions."). Accordingly *Monahan* controls the disposition of Count I; it must be dismissed for failure to state a claim, because § 9501 and § 10841 create no enforceable federal rights.

### b. Counts II, III, and IV: 42 U.S.C. § 290dd–2

In counter-distinction to 42 U.S.C. § 9501 and § 10841, the First Circuit has not addressed whether or not 42 U.S.C. § 290dd–2, a provision in title 42's subchapter "Alcohol, Drug Abuse, and Mental Health Programs," confers enforceable rights on individuals in Briand's position.

Because the directive of the entire statute is relevant to the implied right of action inquiry I set forth the full text of the statute:

Confidentiality of records

(a) Requirement

Records of the identity, diagnosis, prognosis, or treatment of any patient which are maintained in connection with the performance of any program or activity relating to substance abuse education, prevention, training, treatment, rehabilitation, or research, which is conducted, regulated, or directly or indirectly assisted by any department or agency of the United States shall, except as provided in subsection (e) of this section, be confidential and be disclosed only for the purposes and under the circumstances expressly authorized under subsection (b) of this section.

(b) Permitted disclosure

(1) Consent

The content of any record referred to in subsection (a) of this section may be disclosed in accordance with the prior written consent of the patient with respect to whom such record is maintained, but only to such extent, under such circumstances, and for such purposes as may be allowed under regulations prescribed pursuant to subsection (g) of this section.

(2) Method for disclosure

Whether or not the patient, with respect to whom any given record referred to in subsection (a) of this section is maintained, gives written consent, the content of such record may be disclosed as follows:

(A) To medical personnel to the extent necessary to meet a bona fide medical emergency.

(B) To qualified personnel for the purpose of conducting scientific research, management audits, financial audits, or program evaluation, but such personnel may not identify, directly or indirectly, any individual patient in any report of such research, audit, or evaluation, or otherwise disclose patient identities in any manner.

(C) If authorized by an appropriate order of a court of competent jurisdiction granted after application showing good cause therefor, including the need to avert a substantial risk of death or serious bodily harm. In assessing good cause the court shall weigh the public interest and the need for disclosure against the injury to the patient, to the physician-patient relationship, and to the treatment services. Upon the granting of such order, the court, in determining the extent to which any disclosure of all or any part of any record is necessary, shall impose appropriate safeguards against unauthorized disclosure.

(c) Use of records in criminal proceedings

Except as authorized by a court order granted under subsection (b)(2)(C) of this section, no record referred to in subsection (a) of this section may be used to initiate or substantiate any criminal charges against a patient or to conduct any investigation of a patient.

(d) Application

The prohibitions of this section continue to apply to records concerning any individual who has been a patient, irrespective of whether or when such individual ceases to be a patient.

(e) Nonapplicability

The prohibitions of this section do not apply to any interchange of records—

(1) within the Uniformed Services or within those components of the Department of Veterans Affairs furnishing health care to veterans; or

(2) between such components and the Uniformed Services.

The prohibitions of this section do not apply to the reporting under State law of incidents of suspected child abuse and neglect to the appropriate State or local authorities.

(f) Penalties

Any person who violates any provision of this section or any regulation issued pursuant to this section shall be fined in accordance with Title 18.

(g) Regulations

Except as provided in subsection (h) of this section, the Secretary shall prescribe regulations to carry out the purposes of this section. Such regulations may contain such definitions, and may provide for such safeguards and procedures, including procedures and criteria for the issuance and scope of orders under subsection (b)(2)(C) of this section, as in the judgment of the Secretary are necessary or proper to effectuate the purposes of this section, to prevent circumvention or evasion thereof, or to facilitate compliance therewith.

(h) Application to Department of Veterans Affairs

The Secretary of Veterans Affairs, acting through the Under Secretary for Health, shall, to the maximum feasible extent consistent with their responsibilities under Title 38, prescribe regulations making applicable the regulations prescribed by the Secretary of Health and Human Services under subsection (g) of this section to records maintained in connection with the provision of hospital care, nursing home care, domiciliary

care, and medical services under such Title 38 to veterans suffering from substance abuse. In prescribing and implementing regulations pursuant to this subsection, the Secretary of Veterans Affairs shall, from time to time, consult with the Secretary of Health and Human Services in order to achieve the maximum possible coordination of the regulations, and the implementation thereof, which they each prescribe.

42 U.S.C. § 290dd–2.

Prior to *Gonzaga University* three other Circuits concluded that this provision did not create a private right of action and/or a right enforceable through a § 1983 action. In *Ellison v. Cocke County,* 63 F.3d 467 (6th Cir.1995) the Third Circuit found "no private right of action exists under Section 290dd–2 and that Section 290dd–2 creates no substantive rights that would enable [the plaintiff] to invoke a Section 1983 claim." *Id.* at 469. Relying mainly on factors examined in *Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), *Ellison* observed:

> Nothing in the language of Section 290dd–2 suggests that Congress intended to create a private right of action for violations of the confidentiality provision. On the contrary, that language establishes that Congress intended the statute to be enforced through the imposition of criminal penalties. Of course the fact that a statute provides for a criminal penalty "does not necessarily preclude the implication of private cause of action for damages." *Cort,* 422 U.S. at 79, 95 S.Ct. 2080. However, courts are "especially reluctant" to recognize additional remedies where a statute expressly provides a remedy. *[Transamerica Mortgage Advisors, Inc. v.] Lewis,* 444 U.S. [11,] 19, 100 S.Ct. 242, 62 L.Ed.2d 146 [(1979)]. Furthermore, although the confidentiality provision is designed to benefit "patients," a specific and identifiable class of which [the plain-

tiff] was a member, "the question is not simply who would benefit from the act, but whether Congress intended to confer federal rights upon those beneficiaries." *California v. Sierra Club,* 451 U.S. 287, 294, 101 S.Ct. 1775, 68 L.Ed.2d 101 (1981) (citation omitted).

*Id.* at 470, 63 F.3d 467. The *Ellison* Court viewed the "thrust of the Act [as] wholly administrative and bureaucratic: to coordinate federal drug abuse prevention efforts." *Id.* at 471. In examining the context of the statute to discern Congressional intent, the Court found "no indication that the confidentiality provision was intended to be enforceable by aggrieved private parties; the purpose of the provision was not to create private rights as much as it was to create public penalties in order to deter disclosure." *Id.See also id,* at 472–73 (Ryan, Cir. J., concurring) ("In my judgment, the class for whose 'especial benefit' § 290dd–2 was enacted comprise persons who voluntarily seek treatment for their drug abuse.").

Judge Easterbrook, writing for the Seventh Circuit in *Chapa v. Adams,* 168 F.3d 1036 (7th Cir.1999), agreed with *Ellison* that § 290dd–2 did not support a private damage action. "Today," the Court stated, "the principal question is whether the statute creates rights in favor of identified persons. If yes, a private action to enforce these rights is apt to be inferred; otherwise not." *Id.* at 1038. Characterizing § 290dd–2 as a "criminal prohibition," the Court observed that "it has been a long time since the Supreme Court used a criminal law as the basis of a private civil action." *Id.* at 1037. It stated:

> Criminal statutes, which express prohibitions rather than personal entitlements and specify a particular remedy other than civil litigation, are accordingly poor candidates for the imputation of private rights of action.

*Id.* at 1038. The Panel noted: "Like other criminal statutes § 290dd–2 creates rights in favor of society, not just particular members of society." *Id.* "So we are content to leave enforcement of § 290dd–2 to the criminal process," stated the Panel. *Id.*

Most recently, in *Doe v. Broderick*, 225 F.3d 440 (4th Cir.2000), the Fourth Circuit tackled the question of whether § 290dd–2 afforded the § 1983 plaintiff an individual statutory right. *Doe* involved a case in which there was a blatant disregard of the confidentiality and disclosure provisions of the statute. Covering much of the same ground as (and citing) *Chapa* and *Ellison*, the *Doe* Panel stated: "In our view, Congress did not enact section 290dd–2 for the *principal* benefit of Doe and others who receive treatment at drug rehabilitation facilities." *Id.* at 447. "To begin with," the Fourth Circuit noted "this statute is an unlikely spot for Congress to establish an actionable right, and we say this primarily because section 290dd–2 imposes criminal sanctions on would-be violators." *Id.* The Panel elaborated that the Supreme Court disfavored inferring private rights vis-à-vis criminal statutes "because criminal statutes are usually couched in terms that afford protection to the general public instead of a discrete, well-defined group." *Id.* at 447–48.[5] It reasoned:

> There is nothing in the text of section 290dd–2 to indicate that Congress had in mind the creation of individual rights. For example, instead of providing patients with the right to maintain the privacy of their records, subsection (a) establishes a broad proscription against the disclosure of substance abuse treatment records maintained not only for rehabilitation but for education, training,

and research. *See* 42 U.S.C.A. § 290dd–2(a). Subsection (b) permits disclosure pursuant to a court order that balances "the public interest and the need for disclosure against the injury to the patient, to the physician-patient relationship, and to *the treatment services.*" *See* 42 U.S.C.A. § 290dd–2(b)(2)(C) (emphasis added). The language used in section 290dd–2 suggests that Congress was concerned primarily with fostering programs aimed at curtailing our nation's staggering substance abuse problems. The primary beneficiary is the public. Ensuring the confidentiality of patient records encourages voluntary participation in such programs which, in turn, improves public health. *See Chapa*, 168 F.3d at 1038 ("Like other criminal statutes, § 290dd–2 creates rights in favor of society, not just particular members of society.... Addicts will be more likely to accept treatment—and the rest of society therefore will be better off—if treatment is confidential."). Legislative history, moreover, confirms that Congress enacted the section as part of an effort to combat the American public's drug abuse problem and that Congress intended to encourage individuals to seek treatment.

*Id.* at 448–49.

These Courts of Appeal precedents provide a persuasive basis for not allowing Briand to proceed with his counts that rely on § 290dd–2. And, I conclude that *Gonzaga University* only serves to further support this trio of decisions.

*Gonzaga University* revolved around the following Family Educational Rights and Privacy Act (FERPA) subsection:

---

**5.** *Doe* also noted a distinction between the overlapping inquiries of statute-based § 1983 claims and implied rights of actions, observing that in either case courts must determine whether Congress has "created a right to be enforced." *Id.* at 448, 122 S.Ct. 2268. The discussion of this question in *Gonzaga University* that is addressed above has further clarified this point.

No funds shall be made available under any applicable program to any educational agency or institution which has a policy or practice of permitting the release of education records (or personally identifiable information contained therein ...) of students without the written consent of their parents to any individual, agency, or organization.

20 U.S.C. § 1232g(b)(1).

Section 290dd–2 shares many of the same characteristics as 20 U.S.C. § 1232g highlighted in the *Gonzaga University* opinion: it also has no express "rights-creating language"; though there are a few references to individual patients, § 290dd–2's terminology is not focused on the individual but is directed generally toward the institutional record keepers; the Secretary must prescribe regulations "to carry out the purposes of this section," regulations that aim at facilitating compliance and/or preventing the evasion of the purposes of § 290dd–2; the references to individual consent can be fairly described as being in the context of policy and practice; and finally, the express penalty is a civil fine under title 18 which is at least as clear a choice of enforcement mechanism as is the withholding of federal funding under FERPA.

■ Therefore, in light of *Ellison, Chapa,* and *Doe,* and with a view to *Gonzaga University,* I recommend that Counts II, III, and IV be dismissed for failure to state claim.

### 3. Count VI: 18 U.S.C § 241

It is a shorter road to the conclusion that 18 U.S.C. § 241 does not provide Briand with a private right of action. This criminal statute reads:

> If two or more persons conspire to injure, oppress, threaten, or intimidate any person in any State, Territory, Commonwealth, Possession, or District in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States, or because of his having so exercised the same; or
>
> If two or more persons go in disguise on the highway, or on the premises of another, with intent to prevent or hinder his free exercise or enjoyment of any right or privilege so secured—
>
> They shall be fined under this title or imprisoned not more than ten years, or both; and if death results from the acts committed in violation of this section or if such acts include kidnapping or an attempt to kidnap, aggravated sexual abuse or an attempt to commit aggravated sexual abuse, or an attempt to kill, they shall be fined under this title or imprisoned for any term of years or for life, or both, or may be sentenced to death.

18 U.S.C. § 241.

In a one-paragraph discussion of multiple criminal statutes framed as a standing concern, the First Circuit concluded that an individual cannot proceed with a private action seeking a remedy for a violation of § 241:

> Generally, a private citizen has no authority to initiate a federal criminal prosecution. *Keenan v. McGrath,* 328 F.2d 610, 611 (1st Cir.1964). Only the United States as prosecutor can bring a complaint under 18 U.S.C. §§ 241–242 (the criminal analogue of 42 U.S.C. § 1983), *Dugar v. Coughlin,* 613 F.Supp. 849 (S.D.N.Y.1985); *Fiorino v. Turner,* 476 F.Supp. 962 (D.Ma.1979), or under RICO, 18 U.S.C. §§ 1961–1963. *Elmore v. McCammon,* 640 F.Supp. 905, 909 (S.D.Tex.1986). These statutes do not give rise to a civil action for damages. *Compare* 18 U.S.C. § 1964(c).

*Cok v. Cosentino,* 876 F.2d 1, 2 (1st Cir. 1989); *accord Rodi v. Ventetuolo,* 941 F.2d 22, 29 n. 1 (1st Cir.1991) (citing *Cok* for

this proposition); *United States v. Wadena*, 152 F.3d 831, 846 (8th Cir.1998) (citing *Cok* and *Lerch v. Boyer*, 929 F.Supp. 319, 322 (N.D.Ind.1996).); *see also Newcomb v. Ingle*, 827 F.2d 675, 676 n. 1 (10th Cir. 1987) ("Section 241 is a criminal statute prohibiting acts of conspiracy against the rights of citizens, and it does not provide for a private civil cause of action.").

 In light of *Cok*, and for the same reasons articulated in discussing *Monahan* and 42 U.S.C. § 9501 and § 10841, Briand's sixth count, to the extent it relies on 18 U.S.C. § 241, does not state a claim. While Briand does also reference the Fourteenth Amendment in this count, I reserve passing on the viability of a Fourteenth Amendment claim as it is better included in my discussion of his Fourth Amendment count below.

### B. Count V: Constitutional Claim

Because Briand's constitutional claim requires examination of record evidence beyond the pleadings I treat Lavigne's motion as to this claim only as a motion for summary judgment. Unlike instances where a court is inclined to *sua sponte* convert a motion to dismiss into a motion for summary judgment, Briand was put on notice at the time Lavigne's motion was filed that Lavigne was moving for summary judgment as an alternative to dismissal. Accordingly, he has had a "reasonable opportunity to present all material made pertinent to such a motion by Rule 56." Fed.R.Civ.P. 12(b). I recommend granting Lavigne summary judgment on Count V for the following reasons.

### 1. Summary Judgment Standard

Lavigne in entitled to summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits [he has filed] show that there is no genuine issue as to any material fact and that [he is] entitled to a judgment as a matter of law."

Fed.R.Civ.P. 56(c). A " 'material' fact" is one that might affect the outcome of Briand's suit. *Fajardo Shopping Ctr., S.E. v. Sun Alliance Ins. Co., Inc.*, 167 F.3d 1, 7 (1st Cir.1999). I view the record on summary judgment in the light most favorable to Briand, as the nonmoving party. *Santiago–Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 50 (1st Cir. 2000).

If I conclude that Lavigne has evidenced an absence of a genuine issue, substantiated by a rendition of fact that, if uncontroverted, would entitle him to judgment as a matter of law, the burden then shifts to Briand. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 244, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). His response must "plac[e] at least one material fact into dispute," *FDIC v. Anchor Props.*, 13 F.3d 27, 30 (1st Cir.1994), and must "make a showing sufficient to establish the existence of an element essential to [his] case, and on which [he] will bear the burden of proof at trial," *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

### 2. Merits of the Claim

As I noted above, Briand can press constitutional claims in the framework of a *Bivens* action. Count V is entitled "Unlawfully Obtained Privileged Information." It alleges that Lavigne "knowingly and willingly with reckless disregard and deliberate malice, acting in his individual and official capacity, unlawfully obtain[ed] private and privileged information from Dr. Steve Noyes of the Berlin City Mental Health under the title of the United States Probation Office and without court issued order or written consent by the plaintiff, to conduct an investigation for the purpose of a criminal revocation hearing and using same in violation of the Fourth Amendment of the United States Constitution."

Because it is relevant to the disposition of Briand's claims on this score, I note here that Briand peppers his "cause of action" and "request for relief" with references to 18 U.S.C. §§ 3603(2), (7), (8)(a). These subsections provide:

A probation officer shall—

. . . . .

(2) keep informed, to the degree required by the conditions specified by the sentencing court, as to the conduct and condition of a probationer or a person on supervised release, who is under his supervision, and report his conduct and condition to the sentencing court;

. . . . .

(7) keep informed concerning the conduct, condition, and compliance with any condition of probation, including the payment of a fine or restitution of each probationer under his supervision and report thereon to the court placing such person on probation and report to the court any failure of a probationer under his supervision to pay a fine in default within thirty days after notification that it is in default so that the court may determine whether probation should be revoked;

(8)(A) when directed by the court, and to the degree required by the regimen of care or treatment ordered by the court as a condition of release, keep informed as to the conduct and provide supervision of a person conditionally released under the provisions of section 4243 or 4246 of this title, and report such person's conduct and condition to the court ordering release and to the Attorney General or his designee.

18 U.S.C. §§ 3603(2), (7), (8)(a). Probably not inadvertently Briand omits mention of subsection (8)(B)'s directive to Lavigne to: "immediately report any violation of the conditions of release to the court and the Attorney General or his designee." § 3602(8)(B). I also note that subsection

(1) requires the officer to "instruct a probationer or a person on supervised release, who is under his supervision, as to the conditions specified by the sentencing court, and provide him with a written statement clearly setting forth all such conditions." § 3603(1). Briand's theory in raising § 3603 seems to be that Lavigne "violated" his § 3603 duties and acted outside the scope of his employment. (Opp'n Mot. Dismiss at 7; Compl. at "Cause of Action" ¶¶ A, B, "Requested Relief" ¶¶ A, B.)

Also relevant to my inquiry into this claim is the provision of 42 C.F.R. § 2.35, which is the regulation arising from 42 U.S.C. § 290dd–2(g), governing the disclosure anticipated by § 290dd–2(a). Regulation § 2.35 provides:

Disclosures to elements of the criminal justice system which have referred patients.

(a) A program may disclose information about a patient to those persons within the criminal justice system which have made participation in the program a condition of the disposition of any criminal proceedings against the patient or of the patient's parole or other release from custody if:

(1) The disclosure is made only to those individuals within the criminal justice system who have a need for the information in connection with their duty to monitor the patient's progress (e.g., a prosecuting attorney who is withholding charges against the patient, a court granting pretrial or posttrial release, probation or parole officers responsible for supervision of the patient); and

(2) The patient has signed a written consent meeting the requirements of § 2.31 (except paragraph (a)(8) which is inconsistent with the revocation provisions of paragraph (c) of this sec-

tion) and the requirements of paragraphs (b) and (c) of this section.

42 C.F.R. § 2.35. Regulation 2.31 described the requirements of the consent. It provides:

Form of written consent.

(a) Required elements. A written consent to a disclosure under these regulations must include:

(1) The specific name or general designation of the program or person permitted to make the disclosure.

(2) The name or title of the individual or the name of the organization to which disclosure is to be made.

(3) The name of the patient.

(4) The purpose of the disclosure.

(5) How much and what kind of information is to be disclosed.

(6) The signature of the patient and, when required for a patient who is a minor, the signature of a person authorized to give consent under § 2.14; or, when required for a patient who is incompetent or deceased, the signature of a person authorized to sign under § 2.15 in lieu of the patient.

(7) The date on which the consent is signed.

(8) A statement that the consent is subject to revocation at any time except to the extent that the program or person which is to make the disclosure has already acted in reliance on it. Acting in reliance includes the provision of treatment services in reliance on a valid consent to disclose information to a third party payer.

(9) The date, event, or condition upon which the consent will expire if not revoked before. This date, event, or condition must insure that the consent will last no longer than reasonably necessary to serve the purpose for which it is given.

42 C.F.R. § 2.31.

With these statutory and regulatory provisions in mind I address Briand's constitutional claim under the Fourth amendment. This amendment provides:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const.Amend. IV. Briand's theory vis-à-vis the Fourth Amendment is that Lavigne seized confidential records without a court issued order or warrant and without the consent of Briand. (Opp'n Mot. Dismiss at 12–13.) He states that his release to Lavigne was only an authorization to have a third party conference in the office of the Berlin Mental Health Center and was "in no way" a consent to the release of medical records and the contents of confidential communications with the counselor. (*Id.* at 3.) Furthermore, the release was executed under the threat of having his probation revoked. (*Id.* at 5.)

This type of Constitutional claim is not entirely without precedent. *Doe*, for instance, recognized a cognizable Fourth Amendment expectation of privacy claim vis-à-vis records kept at a drug treatment facility. 225 F.3d at 450. Furthermore, in analyzing this claim the Fourth Circuit identified § 290dd–2 as "relevant to the determination of whether there is a 'societal understanding' that [a facility patient] has a legitimate expectation of privacy in his treatment records." *Id.* at 450–51.

In *Doe* the records and photographs of seventy-nine male patients of a methadone

clinic were seized (for two weeks) by an officer after a burglary at a nearby jewelry store and a connected car-jacking. 225 F.3d at 443–45. The officer was successful in getting a warrant based on the following affidavit statement:

> That it is common for people who have addictions [to] various narcotics to include but not limited to heroin, cocaine, methadone, and other schedule one and schedule two narcotics to engage in these kinds of criminal activities to support [their] daily drug addictions. It is your Affiant's experience that heroin and cocaine addicts will obtain stolen vehicles and go on crime spree[s] stealing various merchandise which is easily sold on the streets for [ ] quick cash to support [their] drug addictions. Based on [these] facts, it is your Affiant's belief that . . . (the methadone treatment) clinic holds information on possible suspects.

*Id.* at 444. The Fourth Circuit stated that this affidavit offered no more than "a mere hunch that illegal activity [was] afoot" and, as the defendant admitted, "there was no probable cause justifying the search and seizure of patient records from the methadone clinic, and that no reasonable officer in his shoes could have believed otherwise." *Id.* at 452. It ruled that Doe had stated a claim for a Fourth Amendment violation. *Id.*

■ Though a Fourth Amendment infringement with respect to counseling and treatment records might be found on appropriate facts, the record before me viewed most favorably to Briand simply does not support a conclusion that there has been a Fourth Amendment violation. The January 30, 1998, judgment in Briand's criminal case provided *by order of the court* that Briand would be subject to special conditions of supervision including:

> The defendant shall participate in a program approved by the United States Probation Office for treatment of narcotic addition or drug or alcohol dependency which will include testing for detection of substance abuse. The defendant shall also abstain from the use of alcoholic beverages and/or all other intoxicants during and after the course of treatment. The defendant shall pay for the cost of treatment to the extent he is able as determined by the probation officer.

(Mot. Dismiss Dec.Ex. 2 at 4.)

It is undisputed that Briand signed a consent form for the disclosure of information relating to his counseling, though Briand does contest the scope of the consent. The consent provides that the specific information that he consented to have released to Lavigne was the "intake summary and recommendations" and that the disclosure could be made for the purpose of "coordinate[ing] treatment with legal issues." (Def.'s Reply Mem.Ex. E.) This authorization was provided to Androscoggin Valley Mental Health/Founder Hall, who employed Noyes. (*Id.;* Def.'s Obj.Prelim.Inj.Ex. A ¶ 5.) On August 28, 2000, Noyes called Lavigne and notified him that Briand had signed the written authorization and advised Lavigne that Briand stated he would not participate in substance abuse or mental health counseling. (Def.'s Obj.Prelim.Inj.Ex. A ¶ 5.) On September 25, 2000, Lavigne met with Briand and Noyes at Founder Hall and Lavigne informed Briand that if he refused to participate in drug and alcohol and/or mental health counseling, Briand would be in violation of his supervised release conditions. (*Id.* ¶ 6.) On June 24, 2001, at the time that Briand was involved in a domestic incident with his wife, Briand admitted to Lavigne that he had been drinking. (Def.'s Obj.Prelim.Inj.Ex. A ¶ 7–8.) Lavigne initiated a revocation petition premised on the violations of Briand's conditions of supervised release requiring him

to participate in alcohol, drug, and mental health counseling and to abstain from alcohol. (Def.'s Obj.Prelim.Inj.Ex. A ¶ 9, Dec. Ex. 4.) At the revocation hearing on July 12, 2001, Briand stipulated that he had failed to participate in the domestic violence and anger management counseling at the Berlin Mental Health Service and that he had not abstained from alcohol use. (Def.'s Obj.Prelim.Inj.Ex. A ¶ 10; Tr. Revocation Hr'g attached to Mot.Prelim.Inj.)

Unlike the facts found in *Doe* Lavigne did not "seize" records kept by Noyes or Foundation Hall. At most information that is otherwise subject to confidentiality was verbally relayed to Lavigne on the basis of Briand's written authorization. The only information that this record demonstrates was relayed was the fact that Briand refused to participate in the counseling; there were no details about Briand's communications during counseling or treatment as Briand never participated in counseling with Noyes. What is more, though Briand complains that Lavigne acted without court authority and outside the scope of his own authority, the record can only support the conclusion that Lavigne acted in furtherance of his duties as a probation officer and in conformity with the express supervised release conditions imposed on Briand by the court. I also conclude that the consent signed by Briand meets the requirement of 42 C.F.R. § 2.31. Furthermore, reading 18 U.S.C. § 3603 as a whole, rather than selectively as does Briand, I conclude that this record only supports a conclusion that Lavigne was acting within the scope of his statutory duties.

Briand also asserts in his opposition to the motion to dismiss that his Fifth Amendment rights were infringed because he was deprived of life, liberty, and property when Lavigne unlawfully obtained and used confidential information without a court issued order, an action that resulted in Briand's imprisonment. (Opp'n Mot. Dismiss at 12–13.) He seems to assert that he was deprived of a property right in the confidential information shared between Briand and Noyes. (*Id.* at 13–14.) [6] These theories are utterly without merit.

As for Briand's Fourteenth Amendment claim appended to Count VI, the Fourteenth Amendment provides in part:

> All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

U.S. Const. amend. XIV. § 1. Lavigne is acting under the authority of the Federal government and thus, rather than the Fourteenth Amendment, the analysis above concerning the Fourth Amendment is the appropriate (though unavailing) fulcrum.

---

**6.** In this opposition Briand also takes issue with what he perceives as Lavigne's efforts in his pleadings to place Briand in a bad light by referencing his criminal history and instances of domestic abuse. The nature of Briand's criminal record (beyond the fact that the court ordered that Briand undertake counseling as a condition of his supervised release) and his domestic situation played absolutely no part in this recommended disposition as it is entirely irrelevant to the legal determinations made.

In his opposition Briand also continues to argue his entitlement to injunctive relief. By an order dated May 23, 2002, I recommended denying Briand such relief. If that order did not sufficiently alert Briand that this avenue was closed for him, the dispositive disposition of all counts recommended here should do so.

As this recommended disposition disposes of the claims favorably for Lavigne I have not addressed Lavigne's argument that he is entitled to absolute or qualified immunity. This recommended decision also renders moot Briand's cross-motion for partial summary judgment (Docket No. 7) on the issue of qualified immunity.

## CONCLUSION

For these reasons I recommend that the court **GRANT** Lavigne **SUMMARY JUDGMENT** on Count V and **DISMISS WITH PREJUDICE** the remaining five counts.

## *NOTICE*

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, within ten (10) days of being served with a copy thereof. A responsive memorandum shall be filed within ten (10) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

July 22, 2002.